# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

UNITED STATES OF AMERICA )
*ex rel.* COLLEEN BARDONE, Relator; ) Case No. 4:14-cv-00156-ODS

)
) <u>FILED UNDER SEAL</u>
Plaintiffs, ) <u>JURY TRIAL DEMANDED</u>
v. )
)
)
VITAS HOSPICE SERVICES, L.L.C., )
VITAS HEALTHCARE CORP., )
VITAS CARE SOLUTIONS, INC., )
VITAS HEALTHCARE CORP. OF CALIFORNIA, )
VITAS HEALTHCARE CORP. OF ILLINOIS, )
VITAS HEALTHCARE CORP. OF FLORIDA, )
VITAS HEALTHCARE CORP. OF OHIO, )
VITAS HEALTHCARE CORP. OF ATLANTIC, )
VITAS HEALTHCARE CORP. OF TEXAS, L.P., )
VITAS HEALTHCARE CORP. MIDWEST, )
VITAS HEALTHCARE CORP. OF GEORGIA, )
VITAS HME SOLUTIONS, INC., )
VITAS OF NORTH FLORIDA, )
VITAS HOLDINGS, CORP., )
VITAS RT, INC., )
VITAS SOLUTIONS, INC., )
HOSPICE CARE INC., )
CHEMED CORPORATION, )
COMFORT CARE HOLDINGS CO., )
BALMORAL GP, L.L.C. d/b/a )
TRINITY NURSING AND REHABILITATION )
CENTER, L.L.C., )
DELMAR GARDENS )
OF OVERLAND PARK, INC., )
DELMAR GARDENS OF OVERLAND PARK )
OPERATING, L.L.C., )
DELMAR GARDENS OF LENEXA, INC., )
DELMAR GARDENS OF LENEXA )
OPERATING, L.L.C., and )
OTHER TO BE NAMED DEFENDANTS, )
)
Defendants. )

{00327211.DOCX}

<u>**COMPLAINT FOR VIOLATIONSOF**</u>
<u>**THE FEDERAL FALSE CLAIMS ACT AND ANTI-KICKBACK STATUTE**</u>

On behalf of the United States of America and herself, Relator Colleen Bardone ("Relator") files this *qui tam* complaint against Defendant Chemed Corporation ("Chemed") and its above-captioned subsidiaries Vitas Hospice Services, L.L.C., Vitas Healthcare Corp., Vitas Care Solutions, Inc., Vitas Healthcare Corp. of California, Vitas Healthcare Corp. of Illinois, Vitas Healthcare Corp. of Florida, Vitas Healthcare Corp. of Ohio, Vitas Healthcare Corp. of Atlantic, Vitas Healthcare Corp. of Texas, L.P., Vitas Healthcare Corp. Midwest, Vitas Healthcare Corp. of Georgia, Vitas HME Solutions, Inc., Vitas of North Florida, Vitas Holdings, Corp., Vitas RT, Inc.,Vitas Solutions, Inc., Hospice Care Inc., and Comfort Care Holdings Co., (collectively referred to as "the Vitas Defendants") as well as Balmoral GP, L.L.C. d/b/a Trinity Nursing and Rehabilitation Center ("Trinity"), Delmar Gardens of Overland Park, Inc. and Delmar Gardens of Overland Park Operating, L.L.C. (collectively "DGOP"), Delmar Gardens of Lenexa, Inc. and Delmar Gardens of Lenexa Operating , L.L.C. (collectively "DGOL"), and other to be named Defendants, and alleges as follows:

I.      <u>NATURE OF THE CASE</u>

1.      This is a civil fraud action brought by a private person known as a *qui tam* relator, or whistleblower, on behalf of the United States of America pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et. seq.*

2.      The Relator's allegations pertain to illegal referral agreements and kickbacks between the Vitas Defendants and Kansas City area nursing homes, namely – Trinity Nursing and Rehabilitation Center in Merriam, Kansas ("Trinity"), Delmar Gardens of Overland Park in

{00327211.DOCX}

Overland Park, Kansas ("DGOP"), Delmar Gardens of Lenexa located in Lenexa, Kansas ("DGOL"), and other to be named nursing facilities in the Kansas City Metro area in Kansas, Missouri and upon information and belief, nationwide. Together, Trinity, DGOP, DGOL and the other to be named nursing home defendants are referred to throughout this Complaint as the "Nursing Home Defendants."

3.     In particular, the Vitas Defendants and the Nursing Home Defendants are engaged in the following conduct which violates the federal Anti-kickback Statute and results in the submission of false claims to the Medicare Program:

(a)     Vitas is referring Medicare patients who elect hospice care in hospitals and doctors' offices to select nursing homes in order to induce those nursing homes to refer more patients to Vitas;

(b) Vitas is knowingly providing a kickback to nursing homes by failing to submit and/or delaying the submission of the patient's hospice certification of terminal illness to Medicare so that the Nursing Home Defendants may fraudulently bill or continue to bill for the patient's remaining days of Medicare's skilled nursing benefit;

(c) Vitas is knowingly providing a kickback to nursing homes by using Vitas staff members and supplies to care for the daily needs of the nursing home patients until their twenty (20) Medicare covered days of skilled nursing care are exhausted; and

(d) To perpetrate this fraud, Vitas staff members forge and/or alter patient medical records, including Certifications of Terminal Illness and intake notes, which result in the transmission of false data to Medicare's Common Working File, and upon which Medicare relies to pay claims for hospice care.

{00327211.DOCX}

4. This action seeks to recover damages and penalties on behalf of the United States of America arising from false claims and statements made and presented by the Defendants and/or their agents and employees under the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.* and in violation of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 30:4D-17(c).

5. The violations alleged herein involve false and fraudulent claims the Defendants have made or caused to be made since at least 2010. It is estimated that this fraud has cost the Medicare Programs hundreds of millions of dollars, and is ongoing.

6. Knowing that the claims submitted to Medicare were not eligible for payment because they were generated by illegal referral relationships and violations of the Anti-Kickback statute, the Vitas Defendants and the Nursing Home Defendants nonetheless submitted such false claims and created and/or used false records to support their false claims to Medicare.

7. The FCA provides that any person who engages in such conduct by knowingly submitting or causing to be submitted, a false or fraudulent claim, to the government for payment or approval, is liable for up to three times the amount of the damages sustained by the government as well as other relief the court may deem appropriate. The FCA also provides for civil penalties for each such claim submitted or paid in the amount of $5,500 to $11,000 per claim.

8. Liability attaches under the FCA when a defendant submits or causes another to submit a claim for payment from government funds that the defendant knows is unwarranted and when false records or statements are knowingly made or used to get a false or fraudulent claim for government funds paid or approved.

9. Liability also attaches under the FCA when a defendant knowingly makes, uses, or causes to be made, a false record or statement to conceal, avoid or decrease an obligation to pay or

Case 4:14-cv-00156-BCW   Document 1   Filed 02/14/14   Page 4 of 29

transmit money to the government or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the government.

10.     The FCA permits any person having information regarding false or fraudulent claims for payment from government funds to bring an action for himself as the Relator and for the government and allow him to share in any recovery.   It is a requirement under the FCA that the Complaint be filed under seal (without service on the Defendants) to enable the government to conduct its own investigation without the Defendants' knowledge and to allow the government an opportunity to intervene in the action.

11.     Based on these provisions, Relator, Colleen Bardone, seeks to recover damages and civil penalties arising from the Defendants' presentation of false and fraudulent records, claims, statements, certifications, and reverse false claims made to the United States of America, in connection with Defendants' practices and programs funded through the Medicare Program. Relator seeks to recover all available damages, civil penalties, and all other relief available for expenditures impacted by Defendants' fraud, including all expenditures by the United States.

II.     <u>JURISDICTION AND VENUE</u>

12.     This Court has subject matter jurisdiction pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331 and 1345.   The underlying facts that support this Court's jurisdiction are set forth below in greater detail.

13.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the Defendants transact business within this district and because acts set out in 31 U.S.C. § 3729 occurred within this district.

{00327211.DOCX}

5

14.     Relator, Colleen Bardone brings this action on behalf of herself and the Government pursuant to 31 U.S.C. § 3730(b)(1).

15.     As defined by 31 U.S.C. § 3730(e)(4)(B) of the FCA, Ms. Bardone is the "original source" of the allegations made herein.


III.    <u>PARTIES</u>

16.     The Relator, Colleen Bardone, was employed as a Hospice Marketing Representative by Vitas from July 2012 through October 2013.   She has nearly 13 years of experience working healthcare related sales and marketing. Ms. Bardone worked in Vitas's Kansas City regional area which operates out of two locations: 4041 South Lynn Court Drive Independence, MO, and the office to which she reported located at 13314 West 98th Street Lenexa, Kansas.   In her capacity as hospice marketing representative, she was a "hospital rep" in charge of building referral networks for Vitas with Kansas City area doctors and particular hospitals namely, Providence Medical Center located at 8929 Parallel Pkwy, Kansas City, Kansas 66112, Olathe Medical Center located at 20333 West 151st Street, Olathe, Kansas 66061, Shawnee Mission Medical Center located at 9100 W. 74th Street, Shawnee Mission, Kansas 66204, Menorah Medical Center located at 5721 W. 119th Street, Overland Park, Kansas 66209-3722, and Overland Park Regional Medical Center 10500 Quivira Road, Lenexa, Kansas 66215.

17.     While Ms. Bardone worked as a hospital rep for Vitas, she had counterparts employed by Vitas known as "facility reps" who worked at building referral networks within Kansas City, KS and Kansas City, MO area skilled nursing facilities, namely – Trinity, DGOP, DGOL, and other area nursing home facilities.

{00327211.DOCX}

18.     Both the hospital reps and the facility reps working for Vitas in its Kansas City Region reported to Vitas's General Manager, Julia Vandervelde; Regional Director of Market Development, Evan Leonard; and Director of Market Development, Lisa Barnes. Ms. Vandervelde and Ms. Barnes had oversight of Vitas's operations in both Kansas and Missouri.   Mr. Leonard had oversight of Vitas's operations in Kansas, Missouri, Ohio, and other states.

19.     Defendant Chemed is a publically traded Delaware Corporation with its principal place of business located at 2600 Chemed Center 255 East Fifth Street Cincinnati, Ohio 45202.

20.     Defendant Chemed also wholly owns Chemed RT, Inc. and Comfort Care Holdings Co.

21.     Chemed acquired the Vitas Defendants and become involved in the hospice business in 2004.   Vitas has been in operation since 1978.

22.     Defendants Vitas Hospice Services, L.L.C., Vitas Healthcare Corp., Vitas Care Solutions, Inc., Vitas Healthcare Corp. of California, Vitas Healthcare Corp. of Illinois, Vitas Healthcare Corp. of Florida, Vitas Healthcare Corp. of Ohio, Vitas Healthcare Corp. of Atlantic, Vitas Healthcare Corp. of Texas, L.P., Vitas Healthcare Corp. Midwest, Vitas Healthcare Corp. of Georgia, Vitas HME Solutions, Inc., Vitas of North Florida, Vitas Holdings, Corp., Vitas RT, Inc.,Vitas Solutions, Inc., and Hospice Care Inc. are for-profit hospices operating nationwide and wholly owned subsidiaries of Comfort Care Holdings Co.

23.     Defendant Vitas is headquartered at 100 South Biscayne Boulevard Miami, Florida 33131.  With, 52 hospice programs in the District of Columbia and in 18 States – Alabama, California, Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Kansas, Michigan, Missouri, New Jersey, Ohio, Pennsylvania, Texas, Virginia and Wisconsin - Vitas touts itself on being "the nation's leading provider of hospice services."

{00327211.DOCX}

7

24.     Trinity Nursing and Rehabilitation Center ("Trinity"), is a 120-bed skilled nursing facility currently registered as an active Kansas limited liability company with the Kansas Secretary of State under the name of Balmoral GP, L.L.C.   Trinity is physically located at 9700 West 92nd Street, Merriam, Kansas.   According to its website, Trinity is a "not-for-profit faith based long term care organization."   Trinity's website also indicates that the facility is "Medicaid and Medicare approved."

25.     Delmar Gardens of Overland Park ("DGOP") is a 120-bed skilled nursing facility registered with the Kansas Secretary of State as a for-profit corporation.   DGOP is physically located at 12100 West 109th Street, Overland Park, Kansas 66210.   According to its website, DGOP's current administrator is Mr. Alan Ware.   DGOP has an active Medicare billing provider identification number.

26.     Delmar Gardens of Lenexa ("DGOL") is a 250-bed skilled nursing facility registered with the Kansas Secretary of State as a for-profit corporation.    DGOL is physically located at 9701 Monrovia, Lenexa, Kansas 66215.   According to its website, DGOL's current administrator is Ms. Katie Allen.   DGOL has an active Medicare billing provider identification number.

27.     Upon information and belief, there are other Kansas City area nursing homes, in both Kansas and Missouri, that knowingly participate in Vitas's scheme and should be Defendants in this action.

IV.     GENERAL ALLEGATIONS

28.     The allegations in this case focus on Vitas's hospice services billed to Medicare provided in 2,624 nursing homes, assisted living communities and residential care facilities throughout the United States.   The allegations in this Complaint also pertain to the false billing of

Case 4:14-cv-00156-BCW   Document 1   Filed 02/14/14   Page 8 of 29

Medicare Part A skilled nursing services at Trinity, DGOP, DGOL and the other skilled nursing facilities ("SNFs") with which Vitas may contract and carry out the illegal kickback scheme alleged herein, on a national level.

29.     The Medicare Program was established by Congress in 1965 pursuant to Title XVII of the Social Security Act.   The aim of the Medicare Program is to provide health insurance for the elderly and the disabled.   Specifically, people 65 years of age and older, people under age 65 with certain disabilities, and people of all ages with end-stage renal disease.

30.     Medicare Part A provides basic hospital insurance.   Medicare Part B covers physician's services and other medical services not covered by Part A.

31.     Both the Medicare hospice benefit and qualifying stays in skilled nursing facilities are covered under Medicare Part A.


A.   Background on the Medicare Part A Hospice Benefit

32.     The Medicare hospice benefit was established by Congress in 1982.   The hospice benefit is intended to provide palliative care to individuals who have six months or less to live and who elect to forgo further curative treatment of a terminal illness.

33.     Today, Medicare is the predominate source of payment for hospice services. According to the National Hospice and Palliative Care Organization ("NHPCO"), in 2012, as compared to other payment sources, nearly 84% of hospice patients were covered by Medicare.

34.     In 2011, Medicare paid $13.7 billion for hospice care for 1.2 million beneficiaries.[1]

_____

1  *See* Department of Health and Human Services, Office of Inspector General, Memorandum Report: *Medicare Hospice: Use of General Inpatient Care*, OEI-02-10-00490 (May 3, 2013).

{00327211.DOCX}

35.     To be eligible for Medicare's hospice benefit, federal law requires that a beneficiary be covered by Medicare Part A and be certified as having a terminal illness with a life expectancy of six months or less if the disease runs its normal course.   *See* Social Security Act, §§ 1814(a)(7)(A) and 1861(dd)(3)(A); 42 C.F.R. §§ 418.20 and 418.22.

36.     Certification occurs when a physician completes a Certification of Terminal Illness for the patient. Specifically, the first 90-day period of hospice care begins once the individual's attending physician (as defined in section section 1861(dd)(3)(B) of the Social Securtity Act), and the medical director (or physician member of the interdisciplinary group described in section 1861(dd)(2)(B)) of the hospice program providing (or arranging for) the care, each certify in writing, at the beginning of the period, that the individual is terminally ill (as defined in section 1861(dd)(3)(A)), and based on the physician's or medical director's clinical judgment has six months or less to live if the individual's illness were to run its normal course.   *See* Social Security Act § 1814 (a)(7).

37.     No one other than a medical doctor or doctor of osteopathy can certify a terminal illness. *Id.*

38.     In addition, on the Certification of Terminal Illness, the physician must include a brief narrative of the clinical findings that support a life expectancy of six months or less.   The physician must sign the certification form immediately following the narrative.

39.     The physician signing the certification certifies that he/she composed the narrative based upon either a review of the patient's medical records or an actual examination of the patient. The narrative must be personalized for each patient and cannot consist of checked boxes or form language used for all patients.

{00327211.DOCX}

10

40.     A Certification of Terminal Illness may be obtained up to 15 calendar days before a patient elects to receive hospice. *See* 42 C.F.R. § 418.22(a)(2). However, once a beneficiary elects hospice, the hospice must obtain either oral or written certification within 2 calendar days. *Id.* (a)(3)(i).   If the hospice cannot obtain written certification with the 2 days, it must obtain oral certification. *Id.* at (a)(3).

41.     If oral certification is initially obtained, a written certification must be obtained before a claim for hospice care is properly submitted for payment.   *Id.* at (a)(2).

42.     In terms of document retention and notation, the hospice staff is required to make an appropriate entry in the patient's medical record as soon as oral certification is received and required to file all written certifications in the medical record timely.   *See* 42 CFR § 418.22(d).

43.     Once a Medicare patient is certified as terminally ill, he or she may then file a hospice election statement with a chosen hospice.   *See* 42 CFR § 418.24.   The election statement must: (a) identify the particular hospice providing the patient care; (b) contain an acknowledgement by the patient that he or she understands that hospice care will be palliative rather than curative; (c) contain an acknowledgment by the patient that by electing hospice care, he or she will be waiving Medicare coverage for skilled care and other services as defined in 42 CFR § 418.24(d); (d) identify the effective date of the election – it may later than the date of the election statement, but never earlier; and (e) contain the signature of the patient of his/her representative.

44.     Once a patient completes an election statement, the effective date selected must be entered into the Medicare Common Working File ("CWF").   The date on the election statement represents the date on which the patient wishes to begin receiving hospice and agrees to waive services and Medicare coverage for curative care services – including skilled nursing care under Part

{00327211.DOCX}

11

A. A patient may voluntarily revoke his or her election statement at any time, but the hospice cannot alter or revoke the date an election is made.[2]

45.	There are four levels of care under the Medicare hospice benefit - (1) routine home care; (2) respite care; (3) general in-patient care; and (4) continuous care.  *See* 42 C.F.R. § 418.302.

46.	Routine home care is the most common.   Medicare reimburses the hospice at the routine home care rate for each day a beneficiary is under care and not in need of one of the other levels of care.   The rate for routine home care in 2012 was $151.03 per day.

47.	Respite care is short-term in-patient care provided when necessary to relieve a beneficiary's normal caregiver(s).   The rate for respite care in 2012 was $156.22 per day.

48.	General in-patient ("GIP") care is sometimes required for pain control and symptom management.   GIP care is not equivalent to hospital level of care but it is provided in an in-patient facility, such as a SNF.   It is the second most expensive level of hospice care.   The rate for GIP care in 2012 was $682.59 per day.

49.	Continuous care or crisis care is the highest level of hospice care.   It goes beyond palliative care and provides for nursing care, covered on a continuous basis for as much as 24 hours a day.   Continuous care is the most expensive type of hospice care.   The rate for continuous care in 2012 was $895.91 per day.

50.	According to the NHPCO, in 2012, 96.5% of hospice care was at the routine home care level, 2.7% was general inpatient ("GIP") care, 0.5% was continuous care and 0.3% was respite care.

---

2 While a hospice may not revoke a patient's election statement, it may discharge a patient consistent with 42 CFR § 418.26.

{00327211.DOCX}

B.    Background on the Medicare Part A Skilled Nursing Benefit

51.    In addition to hospice care, through an extension of the Medicare Part A hospital benefit, Medicare also pays for a beneficiary's post-hospital stay in a skilled nursing facility.    *See* 42 U.S.C. 1495i.

52.    In order to qualify for this coverage, a physician must certify that the patient requires care, such as rehabilitative therapy, and can only be practically cared for at a skilled nursing facility ("SNF").   In making this certification, the physician is attesting to the fact that the patient's condition should improve or respond to curative care.     Essentially, the physician's certification for skilled nursing care is the opposite of the Certification of Terminal Illness, which asserts that the patient's condition is terminal.

53.    Following this certification, the patient's plan of care is prepared by the SNF's medical staff based on his/her individual needs and circumstances.

54.    Medicare will only pay for services that are deemed medically necessary by a physician. Accordingly, as Medicare providers, SNFs must certify that their services are provided economically and are only provided to the extent they are medically necessary.

55.    Once those requirements are met, Medicare will pay for 100 days of skilled care per patient, per illness.   The first twenty (20) days of skilled care are completely covered by Medicare, after that, the patient is required to pay a 20% co-pay for his/her remaining days of skilled care. This may be covered by Medicaid if the patient is dual eligible.

56.    Typically, a SNF receives approximately $650 per day for each Medicare patient receiving skilled care.

57.    Once a patient elects to receive hospice care under Medicare Part A, he or she waives the right to Medicare covered skilled nursing care.

58.     Accordingly, it is illegal for a facility to bill Medicare for services under the hospice benefit and the skilled nursing benefit at the same time.


C.      Background on the Federal Anti-Kickback Statute

59.     The Federal Anti-Kickback Statute ("AKS") was enacted in 1972 to protect patients and federal health care programs from fraud and abuse by prohibiting the payment of money to induce the referral of Medicaid or Medicare patients.

60.     As a requirement for participation in any federally funded healthcare program, a provider must certify its compliance with the AKS.

61.     The AKS prohibits the exchange (or offer to exchange), of anything of value, in an effort to induce (or reward) the referral of federal health care program business. *See* 42 U.S.C. § 1320a-7b. Broadly drafted, the AKS establishes penalties for individuals and entities on both sides of a prohibited referral relationship.

62.     Conviction for a single violation of the AKS may result in a fine of up to $25,000 and imprisonment for up to five (5) years. *See* 42 U.S.C. § 1320a-7b(b). In addition, conviction results in mandatory exclusion from participation in federal health care programs. 42 U.S.C. § 1320a-7(a).

63.     Absent a conviction, individuals who violate the Anti-Kickback Statute may still face exclusion from federal health care programs at the discretion of the Secretary of Health and Human Services. 42 U.S.C. § 1320a-7(b). The government may also assess civil money penalties, which could result in treble damages plus $50,000 for each violation of the Anti-Kickback Statute. 42 U.S.C § 1320a-7a(a)(7).

{00327211.DOCX}

14

64.     Although there is no private right of action under the AKS, the False Claims Act provides a vehicle whereby individuals may bring qui tam actions alleging violations of the AKS. *See* 31 U.S.C. §§ 3729–3733.

V.     SPECIFIC ALLEGATIONS

65.     Vitas is certified under the Medicare hospice benefit to provide hospice services.

66.     Vitas provides hospice services in three primary locations: (1) in the homes of hospice patients; (2) in the 36 Vitas-owned dedicated in-patient hospice units; and (3) in hospitals, nursing homes, assisted living communities and residential care facilities.

67.     Hospice providers like Vitas consider Medicare patients residing in nursing homes a significant asset.   A nursing home's patient population not only represents a substantial pool of possible hospice patients, but also the potential for higher gross revenues than at-home hospice patients because hospice patients residing in nursing homes have, on average, longer lengths of stay.

68.     There is a great deal of competition amongst hospice providers for nursing home business.   In 2012, there were more than 3,700 certified hospice agencies in the United States.   In the Kansas City area alone, there are over 50 Medicare certified hospice providers.

69.     Despite this stiff competition, Vitas has been successful in gaining access to nursing home patients. According to its website, it currently has 2,624 contractual agreements with skilled nursing facilities throughout the nation.   In stark contrast to the relatively low national average of 18%[3], an astounding 76% of Vitas hospice patients reside in nursing homes.

---

3     The National Hospice and Pallative Care Organization found that, in 2012, only approximately 18% of hospice patients resided in nursing homes.

{00327211.DOCX}

70. Going back to 1997, the relationships between Medicare certified hospice providers, like Vitas, and skilled nursing facilities have been the subject of intense scrutiny by the Department of Health and Human Services, Office of Inspector General.[4]

71. According to the OIG, arrangements between hospice providers and nursing homes present an inherent opportunity for fraudsters looking to take advantage of Medicare's hospice and skilled care benefits. In particular, the OIG has focused on the opportunity for hospices to offer illegal inducements to ensure that nursing home operators refer them Medicare patients.

A. Kickbacking to Nursing Homes to Ensure a Steady Stream of Referrals

72. Vitas is able to maintain its stronghold as a top national and Kansas City regional nursing home hospice provider because of the illegal kickback arrangements it perpetrates with skilled nursing facilities like Trinity, DGOP and DGOL.

73. In order to induce these and other nursing homes to refer Vitas more patients, Vitas is knowingly and deliberately directing patients who elect hospice care in hospitals and doctor's offices to these select nursing homes.

---

[4] Department of Health and Human Services, Office of Inspector General, Special Fraud Alert: *Fraud and Abuse in Nursing Home Arrangements with Hospices* (March 1998); Department of Health and Human Services, Office of Inspector General, Report OEI-05-95-00250: *Hospice Patients in Nursing Homes* (Sept. 1997); Department of Health and Human Services, Office of Inspector General, Report OEI-05-95-00251: Hospice and Nursing Home Contractual Relationships (Nov. 1997); Department of Health and Human Services, Office of Inspector General, Report OEI-02-06-00220: Medicare Hospice Care: *A Comparison of Beneficiaries in Nursing Facilities and Beneficiaries in Other Settings* (Dec. 2007); Department of Health and Human Services, Office of Inspector General, Report OEI-02-06-00221: *Medicare Hospice Care for Beneficiaries in Nursing Facilities: Compliance with Medicare Coverage Requirements* (Sept. 2009); Department of Health and Human Services, Office of Inspector General, Memorandum Report OEI-02-06-00223: *Medicare Hospice Care: Services Provided to Beneficiaries Residing in Nursing Facilities* (Sept. 2009); and Department of Health and Human Services, Office of Inspector General, Report OEI-02-09-00202: *Questionable Billing by Skilled Nursing Facilities* (Dec. 2010).

{00327211.DOCX}

74.     In addition, Vitas is knowingly providing a kickback to Trinity, DGOP and DGOL and other participating nursing homes by failing to submit or delaying the submission of the Certifications of Terminal Illness of Medicare patients who have elected to receive hospice care.

75.     Vitas does this so that it can provide an illegal inducement to the nursing home by presenting the nursing home the opportunity to bill or continue to bill Medicare Part A for a Medicare patient's remaining days of skilled nursing care.

76.     That is, in exchange for referring Vitas patients on an exclusive or semi-exclusive basis, the participating nursing homes receive $650 per day, per Medicare patient that they bill to Medicare Part A for skilled care.

77.     Vitas's scheme essentially works like this - Medicare will not simultaneously reimburse a skilled nursing facility under Part A and a hospice provider for hospice services.

78.     Accordingly, when a Medicare patient with remaining Part A skilled days is certified as terminally ill and elects Vitas as its hospice provider, Vitas holds off on submitting his or her hospice paperwork to Medicare and does not bill Medicare for hospice until the nursing home has had an opportunity to bill Medicare for all of that patient's remaining skilled care days.

79.     Once the patient has exhausted his or her twenty (20) days of fully-funded Medicare coverage billed by the nursing home, Vitas staff then re-creates a second Certification of Terminal Illness (because the original is outdated by this time), and it is signed by Vitas's in-house Medical Director, Dr. Ahmed Baig.   Only then, does Vitas begin billing Medicare for the hospice benefit.

80.     Essentially, Vitas forgoes anywhere from one to twenty days of billing Medicare for hospice services so that the nursing home can bill Medicare Part A for those days as skilled care.

81.     The terminally ill patients, who are mere pawns in the Defendants' scheme, are unaware that their wish to enroll in hospice has not been honored. This is because they are receiving

"free" un-billed hospice care from Vitas while they reside in the nursing home and the SNF continues to bill.

82. However, because the "paperwork shuffle" needed to orchestrate Defendants' fraud takes time and causes delay, some Vitas patients have been less fortunate and have passed away before ever receiving the hospice care they elected.

83. Vitas disguises its scheme from the patients and their families by re-creating, back-dating and/or forging certifications of illness documentation after the patient's skilled days have run out.

84. The original Certification of Terminal Illness usually completed in the hospital by a staff hospitalist is "lost" or discarded. The patient is transferred to the nursing facility, believing he or she has elected hospice (and that Medicare will be billed by Vitas for hospice), but instead Medicare is first billed for any remaining Medicare full-funded skilled days by the nursing home.

85. While Vitas benefits from this consistent stream of Medicare nursing home patient referrals, the nursing homes who participate in the scheme also benefit in three main ways – (1) Vitas's hospice staff often provide un-billed "free services" or "free labor" to the nursing home – these are generally the overlapping services that would have been provided by the nursing home if the patient had not elected hospice; (2) the nursing home gets to bill Medicare for the remainder of the patient's twenty (20) skilled care days at a rate of $650 per day; and (3) Vitas continues to refer new patients and shuffles old patients back to the nursing home regularly.

86. Because the reimbursement rate for skilled care is nearly $500 more per diem that the rate for routine hospice care, this scheme results in a massive fraud upon the Medicare Program.

87. In 2012, the Medicare reimbursement rate for routine home care under the hospice benefit was $151.03. In 2012, the reimbursement rate for Part A skilled care was $650 per day.

{00327211.DOCX}

88.     To illustrate the enormous impact Defendants' fraudulent scheme has on Medicare, assume that Medicare Patient A, a nursing home resident, enters the hospital after an acute episode. Further, assume that while in the hospital, a hospital physician certifies him as terminally ill, he elects hospice, and lives another 30 days.

89.     Assuming Patient A received routine hospice care for the entire 30 days, the bill to Medicare for his palliative care would be approximately $4,530.90.   However, under Defendants' scheme, if the first 20 days of Patient A's care were billed as skilled care (rate of $650/day) and only the remaining 10 days as hospice care (rate of $151.03/day), the bill to Medicare would be a whopping $14,510.30 – more than three times the true cost.

90.     This illegal kickback arrangement also results in a violation of the terms and conditions of participation in the Medicare Program by the participating SNFs.   To participate in Medicare, these SNFs must certify that their services are provided economically and are only provided to the extent they are medically necessary.

91.     Accordingly, all of the days of skilled care falsely billed by the SNF, after the patient elected hospice, can no longer be deemed medically necessary because the patient has been certified as terminally ill.   Moreover, once a patient elects the hospice benefit, in the statement of election he certifies that he understands he is waiving Medicare coverage for further curative treatments of his terminal illness.

92.     Accordingly, Defendants' kickback scheme is a profitable way for the Vitas Defendants to corner the market on nursing home hospice care and for the participating nursing homes to bill for medically unnecessary services while Medicare foots the bill

{00327211.DOCX}

19

B. Setting "Goals" and Switching Patients

93.    In furtherance of the above scheme, the Vitas Defendants engaged in deceptive and fraudulent business practices with regard to the compensation of their hospice marketing representatives.

94.    To maintain its rank as the number hospice provider in the nation, Vitas provides its hired marketing representatives with substantial monetary incentives to sign up hospice patients.

95.    As a hospital representative for Vitas, the Relator was paid a base salary with the promise of a monthly commission if she made "goal" each month.

96.    On a monthly basis, both the Vitas hospital marketing representatives, like the Relator, and Vitas facility (nursing home) marketing representatives in the Kansas City area were assigned a goal by Vitas's Kansas City executives, which represented the number of hospice patients they were required to sign up with Vitas that month in order to be eligible for a $1,000 cash bonus.

97.    A monthly goal was assigned to each representative by Vitas's corporate regional executives and was allegedly targeted for each representative based upon his or her past performance, the company's current expectations, and any promotions or initiatives Vitas was running for the pending month.

98.    While some representatives would have a goal of signing up six (6) to eight (8) hospice patients in a given month, others had loftier goals.

99.    "Meeting goal" for the month typically meant that the representative would receive a $1,000 bonus on top of his or her base salary.   Representatives would also be compensated for every patient they signed up over their monthly goal.

100.    To engender a sense of competition amongst its representatives, Vitas corporate regional executives would track the number of patients each representative signed up in a grid and

{00327211.DOCX}

send out an email blast to all of the representatives. This was done so that they each could see their rankings with regard to one another.

101. Vitas also ran "contests," giving away gift cards and additional cash awards to representatives who exceeded expectations by signing up more patients and by making goal by the middle of the month.

102. After a few months of working at Vitas, the Relator became frustrated by her inability to meet "goal" with any consistency. When she reviewed her "comp credits" for the month, she began to notice a pattern that troubled her - patients who elected hospice in the hospital were consistently being credited by Vitas's corporate regional executives to the nursing home facility representatives.

103. For months, the Relator battled with the Vitas Kansas City regional executives over patients that she signed up in hospitals that were incorrectly credited to nursing home representatives.

104. However, what the Relator did not immediately understand is that she was just a pawn in Vitas's larger kickback scheme.

105. A hospice provider's access to nursing homes is dependent upon the administrator of the facility granting access to the hospice's marketing representative. That is, the relationship between Vitas's facility representatives and the nursing home administrators is crucial to maintaining its lucrative kickback scheme.

106. That is, Vitas's business practices of switching patients who had elected hospice while they were in-patients in Kansas City regional hospitals to appear as though they elected hospice in a nursing home is done in furtherance of the Vitas Defendants illegal kickback scheme. In order to sustain the illegal referral relationships, described *supra,* between Vitas and the Nursing

{00327211.DOCX}

21

Home Defendants, Vitas had to ensure that its facility representatives were well-compensated. In addition, in order for Vitas to perpetuate the kickback scheme and allow the Nursing Home Defendants to bill for a given patient's skilled days, Vitas had to make it appear as if the patient was in the nursing facility at the time he or she was certified as terminally ill – even though he or she was not.

107.     Vitas is engaged in the above described illegal practices with the Nursing Home Defendants named herein and, on information and belief, with others in the Kansas City area, and perhaps, throughout the United States.

COUNT I:     VIOLATIONS OF THE FEDERAL ANTI-KICKBACK STATUTE
(42 U.S.C. § 1320a-7b(b))

108.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 107 of this Complaint.

109.     The Vitas Defendants altered and/or forged Certifications of Terminal Illness and other documents that are required for Medicare's hospice benefit and completed other illegal acts in order to perpetrate an illegal kickback scheme with the Nursing Home Defendants. Vitas's illegal kickback scheme enables the Vitas Defendants to profit by receiving steady referrals of Medicare patients from the Defendant nursing homes on an exclusive and/or semi-exclusive basis.

110.     As an illegal inducement to the Nursing Home Defendants and to garner the referral of Medicare nursing home patients, after a Medicare patient elects hospice through Vitas, upon his or her transfer back to the nursing home, the Vitas Defendants permit the Nursing Home Defendants to bill Medicare Part A for the patient's remaining days of skilled care prior to Vitas billing Medicare for the patient's hospice benefit, even though the services billed are not medically necessary. The Vitas Defendants and the Nursing Home Defendants do this, despite the patients'

election of hospice care and their agreement to waive all other curative care and treatments for their terminal illnesses.

111. These actions constitute unlawful arrangements which violate the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)) because the Vitas Defendants are providing kickbacks to the Nursing Home Defendants by causing them to submit medically unnecessary claims for skilled nursing care under Medicare Part A. These claims constitute remuneration intended to induce, or offered in return for, the referral of hospice business paid for by Medicare.

112. The Vitas Defendants knowingly caused these false payments to be made by Medicare to the Nursing Home Defendants as a financial inducement for patient referrals to the Vitas Defendants.

113. The Vitas Defendants illegal kickbacks to the Nursing Home Defendants induced improper referrals of services provided to Medicare beneficiaries.

114. The Vitas Defendants arrangements with the Nursing Home Defendants are not protected under the existing "safe harbor" regulations.

115. Since at least 2010, the Vitas Defendants have caused millions of dollars in kickbacks to be paid to the Nursing Home Defendants and the Nursing Home Defendants have received such funds, in perpetration of the above scheme.

116. Pursuant to 42 U.S.C. § 1320a-7a(a), for each of their federal Anti-Kickback Statute violations, Defendants are subject to penalties of up to $50,000 for each improper act, plus damages of up to three times the total of the improper remuneration at issue.

WHEREFORE, Relator requests the following relief:

A. Judgment against the Defendants in an amount equal to up to three times the amount of the improper remuneration at issue;

{00327211.DOCX}

23

B. Imposition of penalties of up to $50,000 for each kickback violation;

C. The Relator's attorney's fees and costs;

D. Such other relief as the Court may deem just and proper.


## COUNT II:    VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
### (31 U.S.C. § 3729 (a)(1)(A),(B) & (C)

117.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 116 of this Complaint.

118.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729 (a)(1), as amended.

119.    As detailed above, the Vitas Defendants provided incentives to the Nursing Home Defendants in order to induce the improper referral of Medicare Part A patients to Vitas and to the exclusive of other hospice providers.

120.    In so doing, the Vitas Defendants and the Nursing Home Defendants both violated 31 U.S.C. § 3729 (a)(1)(A), by knowingly submitting and causing to be presented false claims for payment to the Medicare Program.

121.    Further, the Vitas Defendants knowingly altered, falsified and re-created documents and medical records submitted and used in support of claims for payment under Medicare Part A's hospice benefit in violation of 31 U.S.C. § 3729 (a)(1)(B).

122.    In accepting the incentives offered to them by the Vitas Defendants, the Nursing Home Defendants also violated 31 U.S.C. § 3729 (a)(1)(B), by knowingly submitted false medical documentation in support of their false claims for medically unnecessary skilled nursing care to Medicare Part A.

123.    In addition, as certified Medicare providers, the Defendants each expressly (or impliedly, by their participation in Medicare) certified their compliance with the federal Anti-Kickback Statute.

124.    Both the Vitas and the Nursing Home Defendants violated the federal False Claims Act by submitting claims for reimbursement to Medicare, knowing that the claims were ineligible for the payments sought due to violations of the federal Anti-Kickback Statute.

125.    Accordingly and based on the allegations above, the Vitas Defendants and the Nursing Home Defendants conspired to orchestrate the illegal kickback arrangement, in violation of 31 U.S.C. § 3729 (a)(1)(C).

126.    By virtue of the acts described above, Defendants knowingly or acting with deliberate ignorance or with reckless disregard for the truth, presented or caused to be presented to the United States Government false or fraudulent claims for skilled nursing and hospice services which were reimbursed by the Medicare Program.

127.    Further, all claims submitted by the Vitas Defendants which resulted from the illegal referral relationship (which violates the Anti-Kickback Statute) violate the federal False Claims Act.

128.    All claims submitted by the Nursing Home Defendants that emanated from the illegal referral relationship (which violates the Anti-Kickback Statute) also violate the federal False Claims Act.

129.    The United States, unaware of the falsity of the claims made by the Defendants, paid both the Vitas Defendants and the Nursing Home Defendants for claims that would otherwise not have been allowed.

130.    By knowingly failing to comply with requirements upon which payment was contingent, each claim presented to the United States by the Defendants was false.

{00327211.DOCX}

25

131.    By knowingly, willfully or recklessly presenting false claims for payment to the United States, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1), to the damage of the treasury of the United States of America, by causing the United States to pay out money that it was not obligated to pay.   In carrying out these wrongful acts, Defendant has engaged in a protracted course and pattern of fraudulent conduct that was material to the United States' decision to pay these false claims.

132.    By knowingly, willfully or recklessly causing others to present false claims for payment/reimbursement to the United States, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. §3729(a)(1)(A), to the damage of the treasury of the United States of America, by causing the United States to pay out money it was not obligated to pay.   In carrying out these wrongful acts, Defendants have engaged in a protracted course and pattern of fraudulent conduct that was material to the United States' decision to pay these false claims.

133.    Because Defendants knowingly failed to comply with requirements upon which payment was contingent, any certifications made were false.

134.    By knowingly, willfully or recklessly making false statements and certifications material to the United States' decision to pay on false claims, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. §3729(a)(1)(B), to the damage of the treasury of the United States of America, by causing the United States to pay out money that it was not obligated to pay.   In carrying out these wrongful acts, Defendants have engaged in a protracted course and pattern of fraudulent conduct that was material to the United States' decision to pay these false claims.

Case 4:14-cv-00156-BCW   Document 1   Filed 02/14/14   Page 26 of 29

135.     By knowingly, willfully or recklessly causing others to make false statements and certifications material to the United States' decision to pay on false claims, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. §3729(a)(1)(B), to the damage of the treasury of the United States of America, by causing the United States to pay out money it was not obligated to pay.   In carrying out these wrongful acts, Defendant has engaged in a protracted course and pattern of fraudulent conduct that was material to the United States' decision to pay these false claims.

136.     As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly thousands of false claims that it would not otherwise have paid.

137.     Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

138.     Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000).


WHEREFORE, Relator requests that judgment be entered against Defendants, ordering that:

A.     Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*;

B.     Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendants' actions;

C.     Relator is awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

{00327211.DOCX}

D.     Relator is awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d);

E.     Defendants are enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

F.     Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct; and

G.     The United States and Colleen Bardone recover such other relief as the Court deems just and proper.

<u>JURY DEMAND</u>

A trial by jury is hereby demanded.

Dated:  February 14, 2014

Respectfully Submitted,

BROUS HORN, LLC

By:     **<u>/s/ Carrie M. Brous</u>**
Carrie M. Brous MO #44920
Tammy L. Horn MO #39012
10313 West 140th St.
The Carriage House
Overland Park, KS 66221
Tel. (913) 897-7877
Fax (913) 982-2515
cbrous@broushorn.com
thorn@broushorn.com

{00327211.DOCX}

28

LEVY PHILLIPS & KONIGSBERG, LLP

By:    Alan J. Konigsberg (AJK/6373)
Theresa A. Vitello (TAV/0623)
800 Third Ave., 11th Floor
New York, NY 10022
Tel.   (212) 605-6200
Fax   (212) 605-6290
akonigsberg@lpklaw.com
tvitello@lpklaw.com


ATTORNEYS FOR RELATOR

### Certificate of Service

      I hereby certify that a copy of the foregoing filed under seal was served via express mail

on this 14th day of February, 2014, to:

Eric H. Holder, Jr., Attorney General of the United States
c/o Michael Granston, Renee Brooker, Carolyn B. Tapie and Jenelle Beavers
Attorneys, Civil Division
U.S. Department of Justice, Civil Fraud Division
Commercial Litigation Branch
601 D Street NW
P.O. Box 261, Ben Franklin Station
Washington, D.C.   20004

and served via express mail and electronic mail on this 14th day of February, 2014, to:

Tammy Dickinson, United States Attorney
c/o Lucinda S. Woolery and Thomas M. Larson, Assistant United States Attorneys
Charles E. Whittaker Courthouse
400 E. 9th Street
Kansas City, MO   64106
Cindi.Woolery@usdoj.gov
Tom.Larson@usdoj.gov


*/s/ Carrie M. Brous*_____
Attorney for Relator

{00327211.DOCX}

29